

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### NOS. WR-84,700-01 & WR-84,700-02

### EX PARTE KRISTIE MAYHUGH, Applicant

### ON APPLICATIONS FOR WRITS OF HABEAS CORPUS
### CAUSE NOS. 1995CR1255A-W1 & 1995CR1256A-W1
### IN THE 175TH DISTRICT COURT FROM BEXAR COUNTY

### NO. WR-84,701-01

### EX PARTE ELIZABETH RAMIREZ, Applicant

### ON APPLICATION FOR A WRIT OF HABEAS CORPUS
### CAUSE NO. 1995CR1256B-W1
### IN THE 175TH DISTRICT COURT FROM BEXAR COUNTY

### NOS. WR-84,698-01 & WR-84,698-02

### EX PARTE CASSANDRA RIVERA, Applicant

### ON APPLICATIONS FOR WRITS OF HABEAS CORPUS
### CAUSE NOS. 1995CR1255C-W1 & 1995CR1256C-W1
### IN THE 175TH DISTRICT COURT FROM BEXAR COUNTY

### NOS. WR-84,697-01 & WR-84,697-02

**EX PARTE ANNA VASQUEZ, Applicant**

---

**ON APPLICATIONS FOR WRITS OF HABEAS CORPUS**
**CAUSE NOS. 1995CR1255D-W1 & 1995CR1256D-W1**
**IN THE 175TH DISTRICT COURT FROM BEXAR COUNTY**

---

**ALCALA, J., filed a concurring opinion in which MEYERS, J., joined.**

**CONCURRING OPINION**

Although I do not join the plurality opinion, I agree with this Court's judgment granting relief to all the applicants on the grounds of actual innocence.[1] This case is best summarized by Dr. Alexandria Doyle, a licensed clinical psychologist, who described it as one that "doesn't even pass the smell test." That description is plain speak for my legal conclusion that the four applicants, Kristie Mayhugh, Elizabeth (Liz) Ramirez, Cassandra Rivera, and Anna Vasquez, have proven by clear and convincing evidence that no reasonable juror would convict them in light of the new evidence that has been presented in this case and thus that they are actually innocent. The applicants were convicted of sexual acts they were accused of having committed together in July 1994 against then seven-year-old S.L. and her then nine-year-old sister V.L. Each child claimed that, on two occasions during a single week, the four applicants forcibly held them down and inserted objects into the girls' female

---

[1] Although it mirrors a portion of my analysis, the plurality opinion is lacking in its total rebuke of all the evidence on which the State relied to secure these convictions, and in its failure to more strongly conclude that the evidence of innocence in this case is overwhelming. Furthermore, the plurality opinion does not adequately address the importance of the polygraph evidence, which was included as part of the information on which an expert's opinion was formed, that strongly shows that the applicants are not sex offenders. For those reasons, I have written separately to more fully explain my rationale for concluding that these applicants have proven actual innocence.

sexual organs. Their trial testimony, though riddled with inconsistencies, was supported by the expert testimony of Dr. Nancy Kellogg, who stated at trial that V.L.'s hymen showed scarring, a sign that she had been sexually abused. New scientific evidence, however, now conclusively demonstrates the inaccuracy of this expert testimony that was presented at the applicants' trials. Specifically, in her habeas testimony, Dr. Kellogg has now indicated that V.L. did not have definitive physical signs of sexual abuse, and she has acknowledged that her prior trial testimony was untrue based on a change to the relevant field of science. The logical force of the new scientific evidence combined with the credible recent recantation by S.L., when viewed in light of the totality of the record, clearly and convincingly proves that no reasonable juror would convict applicants of the offenses for which they were previously convicted, and thus, that they are actually innocent of these offenses. I begin my analysis by setting forth the astonishingly weak and excessively contradictory testimony that was introduced at the two jury trials in which the applicants were convicted. After that, I detail the habeas evidence that shows that S.L., who is now an adult, has recently revealed that her father pressured and coached her and her sister V.L. to falsely accuse the four applicants. She also states that her father had a history of fabricating accusations of physical and sexual abuse as a form of retaliation against those whom he believed had wronged him. I then explain the basis for my conclusion that the recantation evidence is far more credible than the contradictory trial testimony by the witnesses. In particular, I consider both that S.L.'s recantation is corroborated by expert psychological testimony that characterized the

complainants' descriptions of the events as fantastical based on a comparison of the applicants' purported acts to the numerous known descriptions of sexual abuse against children, and I further consider that additional expert psychological testimony indicates that the four applicants are not and have never been diagnosed as sex offenders. In light of the totality of this record, I would hold that all the applicants are actually innocent of these offenses.

## I. Evidentiary Analysis of the Two Jury Trials

The four applicants were accused of committing sexual acts against S.L. and V.L. during a single week in the summer of 1994. A review of the evidence produced at the two trials can appear tedious, but it is necessary to show how the proof of guilt in this case was unusually weak.[2] I conclude that, but for the now disavowed medical testimony supplied by

---

[2] One of the applicants, Liz, who was the aunt of S.L. and V.L., was tried in a jury trial at which the late Judge Machado presided. The jury convicted Liz of aggravated sexual assault of a child, for which she received a sentence of thirty-seven years' and six months' imprisonment, and it additionally convicted her of indecency with a child, for which she received a sentence of fifteen years' imprisonment. *Ramirez v. State*, No. 04-97-00144-CR, 1998 WL 412437 (Tex. App.—San Antonio July 22, 1998) (not designated for publication). The Fourth Court of Appeals affirmed her convictions and sentences on direct appeal. *Id.* Liz did not raise a challenge to the sufficiency of the evidence on direct appeal. *Id*. The remaining three applicants—Kristie, Cassandra, and Anna—were tried together before a different jury, with Judge Priest presiding. The jury convicted each applicant of two counts of aggravated sexual assault of a child and two counts of indecency with a child, with each applicant receiving two fifteen-year sentences for the aggravated-sexual-assault counts and two ten-year sentences for the indecency counts. On direct appeal, the Fourth Court of Appeals rejected all three applicants' grounds of error, including challenges to the sufficiency of the evidence, and it affirmed their convictions and sentences. *See Mayhugh v. State*, Nos. 04-98-00262-CR & 04-98-00263-CR, 1999 WL 1246925 (Tex. App.—San Antonio Dec. 22, 1999) (not designated for publication); *Rivera v. State*, Nos. 04-98-00186-CR & 04-98-00187-CR, 1999 WL 1246934 (Tex. App.—San Antonio Dec. 22, 1999) (not designated for publication); *Vasquez v. State*, Nos. 04-98-00245-CR & 04-98-00246-CR, 1999 WL 1246932 (Tex. App.—San Antonio Dec. 22, 1999) (not designated for publication). After serving portions of their prison sentences, all four applicants have

Dr. Kellogg, the excessive amount of contradictory evidence would almost certainly have led to the trial acquittal of the four applicants. Having reviewed in detail the events described by S.L. and V.L., it is impossible to discern what may have occurred. Each version appears to be contradicted by another, often mutually exclusive, version. I detail the evidence here in an attempt to demonstrate the unusual weakness of the trial evidence.

At the age of ten, S.L. testified at the trial for the three applicants; she did not testify at Liz's trial. At the age of eleven, V.L. testified at Liz's trial, and at the age of twelve, she testified at the trial for the remaining three applicants. In addition to the testimony of these witnesses, the juries at the two trials heard evidence from Serafina, the grandmother of S.L. and V.L.; Dr. Kellogg, the doctor who medically examined S.L. and V.L. in 1994; and others.

At the two trials, the juries heard testimony describing (A) the purported first assaults on S.L. and V.L. that occurred during their visit to Liz's apartment, (B) the purported second assaults that occurred at some point after the first incidents of abuse, (C) a weapon or weapons that were used to threaten one or both of the complainants during the assaults, (D) events surrounding a possible telephone call from the complainants' father, Javier, after the first assaults, (E) the events surrounding S.L.'s and V.L.'s outcries, (F) other details about the claimed incidents, and (G) the medical evidence that was then considered to be the crux of the State's case.

**A. Evidence Describing the Purported First Assaults**

---

now been released from prison, either on parole or on bond, pending the outcome of these post-conviction habeas applications.

The evidence presented at the two trials set forth at least six alternative versions of the acts purportedly committed by the applicants against V.L. and S.L. during the time that they visited their Aunt Liz's apartment. The accounts vary from a version in which both complainants were together in the same room during the assaults, as compared to another version in which the complainants were not even in the apartment together because S.L. was locked outside while V.L. was purportedly being assaulted inside. In another version, S.L. said that she was inside the living room when she heard V.L. screaming and then she saw V.L. leave the bedroom without pants before entering the bathroom to shower.  Yet, in another version, S.L. said that V.L. left the bedroom to go play outside.  The multiple versions also vary as to the claims about who held the complainants down and who inserted objects into the complainants' sexual organs.  The inconsistencies that are further detailed below are so great that it is impossible to tell whether a jury would have found any version more plausible than the others.

The first version is the one told by V.L. at the joint trial of the three applicants.[3] V.L. said that on an afternoon about four days after she had arrived at Liz's apartment for a visit, V.L, S.L., and the next-door neighbors' children were playing outside of the apartment.  Liz

---

[3] The substance of V.L.'s testimony at the trial of Kristie, Cassandra, and Anna is recounted in the court of appeals's opinions on direct appeal.  *See Mayhugh v. State*, Nos. 04-98-00262-CR & 04-98-00263-CR, 1999 WL 1246925 (Tex. App.—San Antonio Dec. 22, 1999) (not designated for publication); *Rivera v. State*, Nos. 04-98-00186-CR & 04-98-00187-CR, 1999 WL 1246934 (Tex. App.—San Antonio Dec. 22, 1999) (not designated for publication);  *Vasquez v. State*, Nos. 04-98-00245-CR & 04-98-00246-CR, 1999 WL 1246932 (Tex. App.—San Antonio Dec. 22, 1999) (not designated for publication).

called V.L. inside the apartment and would not allow S.L. inside. V.L. recounted that Liz appeared strange with red eyes and she had trouble walking. Liz told V.L. to go into the bedroom and, when V.L. resisted, Liz pushed her there. Kristie, Cassandra, and Anna were lying on the floor of the bedroom naked from the waist up and wearing pants, and they were drinking beer and wine coolers.[4] Liz took off her shirt when she entered the bedroom with V.L. V.L. said she felt scared when Liz pushed her on the bed. V.L. saw a "liquid, real clear liquid, white powder in a bag, and this tube-looking thing" on the dresser in the bedroom. V.L. said that the bedroom and outside doors were locked so that she could not go outside. V.L. said that the applicants were yelling different things and seemed very mad. One of them told V.L. to take her pants off, and when V.L. refused, Anna took off V.L.'s pants, and someone else took off V.L.'s underwear while two of the women held her down. V.L.'s shirt remained on. After that, V.L. asserted that all four "were touching me all over my body." She said that she was wearing a training bra and that "all of them" touched under her shirt in the area of her breasts and her "middle," which was the phrase she used to describe her female sexual organ. She suggested that the applicants also touched her bottom. V.L. said that Liz was holding her down with one arm and one leg, and that Kristie held V.L.'s arm and leg down. She said that Anna kissed her and placed her fingers inside V.L.'s female sexual

---

[4] Because many of the witnesses have the same last names, and because much of the testimony refers to the individuals by their first names, I have referred to everyone by their first names for consistency and ease of reference. In some places in the testimony, there was a reference to "Kathy," which was likely meant to refer to Cassandra, a.k.a. "Cassie," or possibly Kristie. Although there is no person by the name of "Kathy" involved in this case, I have included that name unaltered as it appears in the record.

organ. Anna put a syringe into the bottle that was on the dresser and then put the clear liquid inside of V.L.'s female sexual organ. Anna then put her finger into the powder that was on the dresser and poured the powder on V.L. and put it in her female sexual organ. Liz and Kristie continued to hold V.L. down while Cassandra touched her. After that, while still being held down, Anna put a tampon inside of V.L. V.L. was then told to go take a shower, which she did.

V.L. stated that, when she got out of the shower, she could hear S.L. in the bedroom screaming, "Leave me alone." V.L. tried to get into the bedroom, but the door was locked. Although she could not enter the locked bedroom, V.L. reported that she could not get out of the apartment because the front door was also locked. V.L. saw that S.L. came out of the bedroom without pants on, and S.L. then went into the bathroom to take a shower.

A second version of the events was told by V.L. at Liz's trial, and it contains many similarities but some glaring inconsistencies. As compared to the trial for the three applicants where V.L. said that the first assault occurred on the fourth day of her visit, V.L. testified at Liz's trial that it happened on the second or third day of her visit. With respect to her trial testimony at the three applicants' trial that she refused to go into the bedroom and was pushed there, in her testimony at Liz's trial, V.L. never mentioned being pushed. Unlike her trial testimony at the three applicants' trial that described the four applicants drinking while yelling things that were not specifically described, V.L., at Liz's trial, mentioned the applicants yelling things that did not make sense like, "[V.L.], why did you do this? Why did

you do that?" In the version told at the three applicants' trial, Kristie, Anna, and Cassandra were lying on the bedroom floor while naked from the waist up when V.L. entered the room, but in the version told at Liz's trial, only two of the women, Anna and Cassandra, were on the floor topless. In the version told at the three applicants' trial, V.L. said that Liz was holding her down with one arm and one leg and that Kristie also held V.L.'s arm and leg down, but at Liz's trial, V.L. said that Liz held her down while Kristie put cold liquid inside of her.

A third version of the events was told by V.L. to Dr. Kellogg during the sexual-assault examination that was conducted as part of the investigation of this case. Although there are some similarities in this statement to V.L.'s trial testimony, V.L.'s statement to Dr. Kellogg contains numerous discrepancies from the version of events that V.L. described in her testimony at the two jury trials. V.L. told Dr. Kellogg that the first assault occurred in the morning rather than in the afternoon; S.L. was permitted into the house during the assault of V.L. rather than being forced to stay outside; the applicants were in the living room watching TV at the beginning of the incident rather than in the bedroom; and V.L. claimed that she was told to drink alcohol, but she did not mention that in her testimony. In addition, V.L. told Dr. Kellogg that, when she entered the apartment, she saw Anna and Kristie on the floor topless watching television, which differed from V.L.'s testimony at the three applicants' trial that stated that Kristie, Cassandra, and Anna were lying on the floor of the bedroom topless, and differed from her testimony at Liz's trial that said that Anna and Cassandra were on the floor

topless.  Furthermore, V.L.'s statement to Dr. Kellogg does not mention that the applicants were drinking or yelling, or that powder was placed inside V.L.'s sexual organ.  Dr. Kellogg summarized the substance of V.L.'s statement as follows:

> It was morning. [S.L.] and I were playing outside, then Liz called us inside. Liz's friends, Anna and Kristie were laying on the floor watching TV, they weren't wearing a shirt or anything on top.  Liz told me to go into the bedroom, then Anna took off my pants and Anna and Kristie started putting things into my front middle.  She also put clear liquid, it felt cold in my middle, Liz and Kathy[5] were holding me down.  Then they told me to take a shower and they got my sister in the room. [Dr. Kellogg] asked, ["]How many times did it happen?["] [V.L.] said two times.  The same thing happened the next day.  They were smoking the first time, she had me drink some wine with soda.  I did not really drink it I faked it.  Liz, Anna, and Kathy were kissing me all over my bottom.  After I heard [S.L.] screaming, I told my grandma.

V.L. told a similar version to the investigating police officer with some slight variations.  V.L. had told Dr. Kellogg that Liz and Cassie held her down, but she told the officer that, in addition, "Anna was holding my other leg."  V.L. told the officer that "Liz had tooken off [her] blue pants," and "Liz had tooken off [her] panties."  In contrast, she told Dr. Kellogg that Anna took off her pants.  In this version, V.L. said that "[S.L.] was in the living room," as compared to some of V.L.'s trial testimony indicating that S.L. was locked outside.

A fourth version of the events was told by S.L. at the joint trial of the three applicants.[6]  S.L.'s trial testimony contradicted parts of V.L.'s story in that, in this version,

---

[5] Based on her statements to the investigating police officer about who held her down, V.L.'s reference to "Kathy" is likely to "Cassie," or Cassandra.

[6] S.L.'s testimony is discussed in the Fourth Court of Appeals's opinions on direct appeal. *See Mayhugh*, 1999 WL 1246925; *Rivera*, 1999 WL 1246934; *Vasquez*, 1999 WL 1246932.

S.L. reported that she was inside the apartment during the purported assault of V.L. rather than forced to stay outside due the locked front door; S.L.'s claimed abuse occurred in the living room rather than in the bedroom, as V.L. had asserted when she said that she heard S.L. screaming in the bedroom and that S.L. walked out of the bedroom without her shorts on; the described demeanor of the applicants was inconsistent in that they were laughing during the assault on S.L., as compared to the yelling that V.L. had described; the applicants were fully clothed and not drinking alcohol, kissing or touching S.L., as compared to V.L.'s testimony that some or all of the applicants were drinking alcohol and topless during V.L.'s assault that had occurred minutes before S.L.'s assault; V.L. did not take a shower after her claimed assault but instead went outside to play, and then later on V.L. took a shower while S.L. played outside; and S.L. went outside to play before taking a shower. Specifically, S.L.'s testimony indicated that, upon entry into the apartment, she heard V.L. screaming from the bedroom. S.L said that she stayed in the living room hearing V.L. screaming from the bedroom while the applicants were in that room. When V.L. came out of the bedroom, S.L. asked V.L. what was wrong and V.L. did not say anything. V.L. then went outside to play. After that, while S.L. was still in the living room, Liz and Kristie took off S.L.'s shorts and underwear while Anna and Cassandra held her down. S.L. indicated that Cassandra "put something," later identified as a tampon, into S.L.'s female sexual organ. S.L. described herself as lying down on the living room floor while one of the applicants put a tampon inside of her and she noted that it "hurt." She said, "They were holding me down so I won't

struggle." S.L. described the applicants as acting "bad," and laughing "like it was funny." She said that no one said anything and that they were not drinking anything. Other than the insertion of the tampon, S.L. said that no one else touched her private area, no one touched her body anywhere, and no one kissed her. S.L. testified that all four women had their clothes on, but that Cassandra raised her shirt up during the incident. After the insertion of the tampon, Cassandra showed S.L. a gun and "[t]hey said don't tell anybody or they were going to shoot someone." She got up and V.L. came into the apartment. V.L. then went to the restroom to go take a shower. Then S.L. got up and went to play inside the apartment. Later, after V.L. took a shower, S.L. also took a shower.

A fifth version of the events was told by S.L. in her statements to the investigating police officer. In that statement, S.L. said that the front door was unlocked, in conflict with V.L.'s testimony that the front and bedroom doors were locked and that S.L. could not get into the apartment and was left outside during the purported assault on V.L. In her statement, S.L. said that when the events occurred all of the women wore clothes, but the purported assault on S.L. would have occurred minutes after the claimed assault on V.L., who said that the applicants were topless. S.L. said that the events against her occurred with her on the living room floor, but V.L. testified that she heard screams and saw S.L. coming out of the bedroom. S.L. said that Liz held her down, in contradiction to S.L.'s trial testimony that the other applicants held her down. S.L. stated that Kristie and Anna put white powder and things inside of S.L.'s sexual organ, in contradiction to S.L.'s trial testimony that a tampon

was the only thing that was used to penetrate her. In her statement, S.L. said that Liz held her down while "Kristie and Anna were putting some white stuff in us." That version conflicts with S.L.'s trial testimony, in which she said that Cassandra and Anna held her down and that Cassandra put the tampon in her.

In a sixth version of the incidents, S.L. described the events to Dr. Kellogg in a way that suggested that she was in the same room as V.L. at the time of at least part of the assaults, but this conflicted with all of V.L.'s versions and S.L.'s other versions that the assaults on V.L. occurred before the assaults on S.L. and while each of the complainants was alone in a room with the applicants. In her recounting of the events to Dr. Kellogg, S.L. said that Liz and Kristie held her down, as compared to S.L.'s trial testimony that Anna and Cassandra held her down. S.L. also said that Cassandra and Anna put things inside her as compared to S.L.'s other statements that Kristie and Anna put the things inside her. Furthermore, during the two trials and in their out-of-court statements to others, the complainants described the various objects that they claimed were placed inside of them as clear liquid, a white powder, or a tampon, but only this statement by S.L. to Dr. Kellogg described one of the objects that was placed into V.L. and S.L. as "pink and when they opened it, it was white and circles and hard."

S.L. told Dr. Kellogg,

It happened two times during the day and at night. They, Kathy and Anna were putting stuff in my and my sister's middle, Liz was holding my feet and Kristie was holding my hands. That—they put it in me—the thing they put in me was, she described the outside was pink and when they opened it, it was

white and circles and hard, she put it in me and my sister's middle. They did
it in the room where Liz sleeps. They said if we tell anyone, they're going to
kill the grown-ups at the house. They took off my shirts and underwear, and
was showing Liz her initials here, and she pointed to her abdomen and her
stomach and her back. Liz had the tattoo, a heart with arrows in her ankle.
They had cigarettes, wine, beer, and white stuff. They had put the white stuff
in my middle. I don't remember anything else.

S.L.'s and V.L.'s descriptions of the first purported assaults conflict even as to the

most elementary facts about whether they were together in the same room during the assaults

and whether the events occurred on the living room floor or the bed of the bedroom. The

discrepancies from these broader points continued to the significantly different details that

were presented by S.L. and V.L. at every telling.

**B. Evidence Describing the Second Time that Acts Were Purportedly Committed**

The complainants indicated that, at some point after the events described above, they

were assaulted a second time during that same week. There are at least three versions of the

acts that purportedly transpired during the second incident of sexual abuse that were

described by S.L. and V.L., although most of the record discusses the statements surrounding

the second incident generally by saying that the same thing happened the second time as what

happened the first time. The discrepancies are of the same type as the ones that occur in the

discussion about the first incidents of purported abuse. In general, the discrepancies as to the

second round of purported assaults include who assaulted V.L. V.L. claimed that she was

assaulted by Liz and Anna while Cassie was in the living room with S.L. and while Kristie

was at work, but S.L. claimed that Kristie was present during the assault on S.L. that

occurred at nearly the same time as the assault on V.L. V.L. testified at the trial of the three applicants that Liz and Anna abused her but, at Liz's trial, V.L. said that she was touched by Liz, Anna, and Cassie. Another discrepancy exists with respect to whether V.L. was alone in the bedroom with the applicants when the second purported assault occurred or whether S.L. watched as objects were placed into V.L.

More specifically, in the first version of the second incident, V.L. testified at the joint trial of the three applicants that, the day after the first assault, a similar incident took place. Liz and Anna took V.L. into the bedroom alone. Anna touched V.L.'s breasts under her clothes while her clothes remained on. Then Liz took off V.L.'s pants and touched her all over her body. Anna reminded V.L. about the gun but did not show it to her. V.L. said that Cassie was in the living room with S.L., who was crying. Kristie was not there because she had gone to work. V.L. stayed a couple more days at Liz's apartment after that.

In a second version of this purported second assault that she said had occurred the day after the first assault, V.L. testified at Liz's trial that she was assaulted by all of the applicants except Kristie. V.L. said that Cassie and Anna kissed her "in [her] vagina and on [her] face," and Liz kissed her on her face. V.L. said that all of this occurred at the same time. This version conflicted with the one told by V.L. at the three applicants' trial where she said that she was assaulted by Liz and Anna while Cassie was in the living room with S.L. and while Kristie was at work. V.L. said that after she was assaulted on that occasion, they ate lunch. V.L. said that the next day that it was time to go home.

In a third version of what transpired during the second incident, S.L. testified at the trial of the three applicants that the same abuse occurred again the next day after the first incident. S.L. said that she was in the living room and "[t]hey put the same thing in my private part." The three applicants held her down while Kristie put a tampon into her private part. S.L. said that no one touched her anywhere else on her body, no one kissed her, and no one said anything to her. S.L. said that V.L. was outside at that time. That same day, S.L was outside when she heard V.L. screaming inside, and at that point S.L. entered the apartment where she "saw them putting that thing in [V.L.]'s private." S.L. said that it was Liz that put the thing in V.L.'s private. S.L said that the four applicants "were in there trying to hold her down, laughing," adding "like it was funny but it wasn't." S.L. said that she was trying to tell them to leave V.L. alone, but they told S.L. to get out so S.L. went outside to play. After that, V.L. came outside to play.

S.L.'s and V.L.'s descriptions of the second purported assaults are mostly vague because their testimony was often that the second assaults were a repeat of what happened during the first assaults. Even so, their descriptions conflict even as to the most elementary facts about whether there were two, three, or four applicants present during the claimed assaults, whether S.L. watched V.L.'s female sexual organ being penetrated with an object, and whether the applicants were laughing at V.L. during the purported assault as S.L. had claimed or they were yelling at V.L. as V.L. had asserted.

**C. Evidence of the Type and Number of Weapons and Who Displayed Them**

There are at least three material inconsistencies in the descriptions of the type and number of weapons used to commit these offenses and of the people who possessed any such weapons. These includes statements indicating that the weapon was a knife or a gun, that there were either one or two guns, and that Liz, Anna, Kristie, or a combination of those individuals held a gun or guns.

First, there was evidence that a knife was the weapon used to intimidate the complainants in this case. At Liz's trial, the complainants' grandmother, Serafina, was asked, "Did [V.L.] ever mention anything about a knife being used to threaten her?" After confirming that the question being asked was about a knife, Serafina responded, "She did mention it." Serafina said that S.L. "said yeah" regarding whether a knife was displayed and that V.L. also mentioned a knife. Serafina testified at Liz's trial that "[a]ll [V.L.] said was that one of the girls had the knife and had told them—threatened them that they were going to do something to their dad and me." In contrast to Serafina's testimony that V.L. and S.L. told her about a threat with a knife, V.L. denied telling Serafina that she had been threatened with a knife. At Liz's trial, V.L. was asked, "Did you ever see a knife there in the apartment when you were there?" V.L. responded, "Only the ones in the kitchen."

Second, there was evidence that only a single gun was displayed, but there were varying accounts about who held the gun and at whom the gun was pointed. In her statement to the police, V.L. said that "Anna held the gun against my—both of our heads. They told us not to tell anyone what happened. After they told us to go play outside." In contrast, at

Liz's trial, V.L. said that Liz placed the gun on V.L.'s head only, and V.L. said, "Liz threatened" "to kill me and my family." In further contradiction, S.L. said at the three applicants' trial that Kristie had the gun and that it was Kristie who made the threat to hurt someone if S.L. told anyone.

Third, there was evidence that there were two guns used in this case. V.L. told Dr. Kellogg that there were two guns: one held by Liz, and one held by Anna. V.L. told Dr. Kellogg that they pointed the guns at her head and threatened to kill S.L.'s and V.L.'s family if they told anyone what had happened.

The descriptions by V.L. and S.L. conflict even as to the most elementary facts about whether the weapon purportedly used to threaten them was a knife or a gun, or one gun or two guns. And there is no clear story about when the purported threat or threats occurred, how they occurred, or by whom they were carried out.

**D. Evidence About Threat to V.L. When Javier Called on the Telephone**

Because S.L. testified at the habeas hearing that she was coerced by her father, Javier, to falsify the allegations against the applicants, the complainants' inconsistent testimony about their contact with Javier during a phone call that may have occurred shortly after the purported first assaults could reveal a lack of veracity about his role in their allegations. There are two inconsistent descriptions of whether there was a telephone call by Javier towards the end of the day of the first assaults and what happened during and after that call. The multiple descriptions suggest that either Javier called that day or he did not call; that

V.L. answered the phone call or Liz answered it; and that Anna threatened V.L. to speak normally to Javier and she did, or that only Liz spoke to Javier.

In the first version of these events, V.L.'s testimony at Liz's trial claimed that V.L. answered the telephone when Javier called after the first assaults and V.L. was threatened to speak normally to him on the telephone. But in a second version of these events, V.L.'s testimony at the three applicants' trial said that Liz answered a telephone call from Javier at the end of the first assaults. After that, Anna threatened V.L. with a gun not to say anything about the assaults, and V.L. then talked to Javier on the telephone in a "normal conversation." Javier did not talk to S.L. on the telephone because S.L. did not want to talk. S.L. gave a third version of the events surrounding a purported telephone call from Javier at the end of the first assaults. S.L. said at the three applicants' trial that she did not recall Javier calling and denied that any threats were made in relationship to any telephone call from Javier.

There is no clear story about what transpired after the first assaults. It is unclear whether Javier called, who answered the phone, whether V.L. talked to Javier on the phone, and whether V.L. was threatened not to tell Javier anything about the assaults. The reason that this could be important is because V.L. claimed that Javier called after the first assaults, but she did not tell him about the assaults because she was threatened with a gun, and S.L. did not want to talk to him. S.L., however, does not recall any phone call or a gun being displayed at that time.

**E. Evidence Describing the Events that Prompted S.L.'s and V.L.'s Outcries**

After the recantation by S.L. and the withdrawal of the medical findings by Dr. Kellogg, all that remains of the State's original case is the testimony of V.L., which I have shown was highly contradictory in that it described multiple inconsistent versions of the events, and the outcry evidence supplied by Serafina. It is necessary, therefore, to detail the outcry evidence to understand why it cannot be used as a basis for rejecting the applicants' actual-innocence claims in this case. There are at least three different versions of the events leading up to S.L.'s and V.L.'s outcries to Serafina. Each of the versions of what transpired is entirely different from the other versions, ranging from V.L. reporting to Serafina that S.L. was playing with her dolls in a strange manner, causing Serafina to make inquiries of both of the girls, to Serafina herself seeing S.L. playing strangely with her dolls causing Serafina to make inquiries of both of the girls, to V.L. deciding to spontaneously tell Serafina about the abuse because of pressure that had built up inside of her.

First, at the trial for the three applicants, Serafina claimed that V.L. had seen S.L. undressing her dolls in a peculiar manner while she was playing outside, and V.L. ran into the kitchen to report the conduct to Serafina, who started making inquiries that led to the outcry. Serafina said that she was in the kitchen cooking when V.L. ran inside to report that S.L. was outside undressing her dolls in a strange way. Serafina told V.L. to tell S.L. to come inside. Serafina said that S.L came inside the house holding her dolls with her head down. Serafina asked V.L. why she thought that S.L. was doing that, and V.L. told her that

"[m]aybe something happened and we can't talk about it." Serafina said that V.L. claimed that if she said anything that "they will hurt you and my dad." Then the girls started crying. Serafina said that, while the two girls were in the kitchen with her, "[t]hey were telling me what the three [applicants] were doing to them, like undressing them, touching them. And that's when I stopped them then we went to the bedroom to finish" talking to get out of the earshot of the teenaged boy in the residence. Serafina said that V.L. was speaking and S.L. was scared, shaking, and would not look at her. Serafina also said that, after the week at Liz's apartment, she saw S.L. and V.L. crying at night and that she would have to go into their bedroom to calm them down.

At the trial for the three applicants, S.L. told a similar story except she said that she was inside and not outside of the house playing with her dolls and that she got into trouble with Serafina for how she was playing with the dolls. S.L. was asked about how the conversation came up with Serafina, and S.L. explained that, while she was inside the house with V.L. and a cousin, someone had seen her playing with dolls doing something that she was not supposed to be doing by taking off the dolls' clothes. She said that she got in trouble for that and Serafina questioned her about how she learned to do it. S.L. replied "nowhere." S.L. stated that V.L. and S.L. then disclosed to Serafina that "we learned when we went . . . to Liz's house, that they put something in our private part." During cross-examination, S.L. said that she was in the living room when she spoke to Serafina and that Serafina had spoken to the girls separately because "she didn't want us to copy off of each other. She wanted us

to say what we saw and felt and hurt."

In another version of the events, V.L. stated that Serafina herself saw S.L. playing with dolls in a way that Serafina thought was inappropriate. After that, Serafina questioned the girls about why S.L. was playing with the dolls in that manner. V.L. said that Serafina did not speak to the girls together about the dolls.

A third version of the events leading up to the outcry was relayed at Liz's trial where the evidence had described Serafina cooking in the kitchen and V.L. approaching her to reveal that she had been abused. While addressing an appellate ground relating to the admissibility of the outcry evidence, the court of appeals detailed how V.L. and Serafina each described this version at Liz's trial. *See Ramirez*, 1998 WL 412437, at *5. The court of appeals said,

> V.L. explained that after a while the pressure began to build up inside of her, so she told her grandmother about the events that had occurred. According to V.L., she approached her grandmother while she was cooking supper. V.L. stated that her grandmother stopped making dinner and went to another room to talk to her.

*Id*.

Similarly, V.L.'s testimony at the trial for the three applicants said that she independently made the decision to tell Serafina about the abuse and was not prompted by any particular event. V.L. said that while S.L. was outside playing with their cousins, V.L. told Serafina that she needed to talk to her. Serafina stopped cooking and they went into V.L.'s room to talk, where she told Serafina "everything that happened to me." V.L. said that

she told Serafina about what had occurred because of her feelings of "pressure, dreams, nightmares." V.L. explained that she had nightmares that the applicants would kill Javier.

With respect to whether an event involving dolls prompted V.L.'s outcry, V.L. denied that, explaining that she did not see or did not remember S.L. playing with the dolls. The record shows the following:

> [Counsel]: The conversation with your grandma, you told us that you brought it up?
> [Answer]: Yes, I did.
> [Counsel]: Didn't something happen with some dolls?
> [Answer]: I don't remember.
> . . . .
> [Counsel]: Do you remember your grandmother talking to you about the way [S.L.] was playing with the dolls?
> [Answer]: No.

The reason that the outcry evidence is consequential is because it is the point at which Serafina and Javier reported their accusations against the four applicants to the authorities. The problem, however, is that there is no clear explanation about what event, if any, caused V.L. and S.L. to reveal the purported misconduct to Serafina and Javier. The inconsistencies in how this outcry occurred cannot be reconciled. The three alternative stories have similar variations but are entirely different accounts of what transpired in that V.L. came into the kitchen to alert Serafina about S.L.'s playing with the dolls causing Serafina to ask questions, or Serafina herself saw S.L. playing with the dolls in a way that caused her to ask questions, or V.L. felt pressure that resulted in her outcry to Serafina followed by S.L.'s almost immediate outcry. The inconsistent versions of what led to the outcry is understandable in

light of the fact that they were each a fictional account of events that never transpired. As discussed more fully in the next section discussing the habeas evidence, S.L.'s recanted version reveals that Serafina and Javier accused the four applicants of the abuse after seeing V.L. kiss a female child with an open mouth, causing them to believe that the lesbian behavior was learned from the four applicants.

**F. Discrepancies in the Reporting of the Events to Javier**

Because S.L. testified at the habeas hearing that she was coerced by Javier to falsify the allegations against the applicants, the complainants' inconsistent testimony about how and when they informed Javier about the assaults could reveal a lack of veracity about his role in their allegations. There are at least three different versions of what was told to Javier and by whom after the outcry to Serafina. The versions include a story that S.L. talked first only to Javier about the purported abuse, or, alternatively, that S.L. and V.L. talked only to Serafina about the purported abuse and not to Javier, or alternatively, that S.L. and V.L. talked to Serafina and then they all also talked to Javier. All of these, of course, are mutually exclusive and cannot all be true. This is important in this case because of the efforts at trial to attempt to minimize Javier's role in the outcry, as compared to S.L.'s habeas testimony that he coached and pressured S.L. and V.L. to falsely accuse the applicants. The glaring inconsistencies about what was told to Javier strongly suggest the lack of the existence of a true version of the events that actually transpired.

Additionally, there are multiple versions of how and when S.L. and V.L. returned

home to Serafina and Javier after the purported assaults. In these versions, Javier picked up the complainants from Liz's house on the evening of the second assault, or the complainants returned home after spending a "couple of weeks" at Liz's apartment. In other alternatives, the complainants were driven home by all four of the applicants, by Liz and Kristie, or by Liz on a Saturday after spending a week at Liz's apartment. These types of details are pertinent in that they further show contradictory information about Javier's interactions with the complainants and applicants during the period of time when the purported assaults occurred.

In sum, my review of the trial records reveals that the witnesses' testimony conflicted in every detail, big and small. Given these gross contradictions in every facet of this case, I conclude that the only reason that the juries could have disregarded these contradictions and convicted the applicants is because of their belief that the medical evidence supported a conclusion that V.L. and S.L. had been sexually assaulted. As we now know, however, the medical evidence was wrong, and it can no longer be used as a proper basis for disregarding the volume of contradictory testimony in this case.

### G. The Medical Evidence Was the Crux of the State's Case in the Two Jury Trials

It is apparent that the only reason that the juries could have rationally disregarded the numerous conflicts in the witness testimony was because of the medical evidence that, at the time, definitively indicated that V.L.'s female sexual organ had been penetrated during the period of time that she was with the four applicants. This is essentially what the court of appeals determined in deciding that the evidence was sufficient to uphold the three

applicants' convictions, despite the numerous factual inconsistencies it addressed in its opinion.[7] Of course, we now know that Dr. Kellogg's medical testimony was inaccurate and untrue.

Dr. Kellogg filed an affidavit in October 2013, in which she stated that, "since 1998, through research and experience, the medical profession has gained a greater understanding of pediatric hymenal trauma." She states that, based on that new understanding, and specifically in light of the study published in 2007, it is now her expert medical opinion that she "cannot determine with reasonable medical certainty whether [V.L.'s] hymen had ever been injured at the time of the 1994 examination." She states that, had the new science been available to her at the time of trial, she would not have testified that her findings in the physical examination of V.L. were indicative of trauma.

The fact that the medical evidence was the "critical" evidence necessary to the State's case is evident from the prosecutor's closing arguments at Liz's trial. The prosecutor's closing argument stated,

---

[7] On direct appeal, the three applicants alleged that the girls' testimony in the latter trial against them differed from the girls' testimony at Liz's trial. *See Mayhugh*, 1999 WL 1246925; *Rivera*, 1999 WL 1246934; *Vasquez*, 1999 WL 1246932. The court of appeals noted six inconsistencies between the two trials: (1) at Liz's trial, the girls claimed that Liz held the gun, and at this trial, the girls claimed that either Anna or Cassandra held the gun; (2) whether the door was locked from the inside or the outside; (3) whether the first incident occurred at 2:00 or 4:00 p.m.; (4) whether there were other children in the house; (5) whether the girls went out to play after the first incident; and (6) the existence and type of weapon in that Serafina did not mention a weapon when she spoke to the police, the weapon was described as a knife at Liz's trial, and it was described as a gun at this trial. The court of appeals decided that the discrepancies did not go to the elements of the offense but instead went only to the credibility of the witnesses, that the medical evidence from Dr. Kellogg supported the convictions, and it left the credibility of the evidence to the fact finder.

> I think Dr. Kellogg, ladies and gentlemen, interestingly enough was perhaps one of the most critical, if not the most critical, witness that you heard from. Let me tell you why I say that. You remember how we talked in Voir Dire about these kinds of cases—child abuse cases, child molestation cases, that in many of these instances we don't have any physical evidence. It's just the word of a child against someone that they trusted, someone by whom they were betrayed. Dr. Kellogg's testimony was critical—absolutely critical in this case because of that. . . . But the medical, physical evidence does not lie.

Setting aside Dr. Kellogg's discredited medical testimony, all that remains in this record is the contradictory testimony by the two complainants and the outcry witness that, taken on its own, would never have reasonably led to any convictions in this case. Even in the absence of the compelling habeas record, which I discuss next, the applicants would be entitled to a new trial on the basis of Dr. Kellogg's revised testimony. But given the compelling habeas record that shows that S.L. has recanted her trial testimony and explained that Javier coached her and V.L. to falsely accuse the four applicants, and given the volume of evidence supporting the credibility of that recantation, I conclude that the applicants are entitled to be found actually innocent by this Court.

## II. Evidentiary Analysis of the Habeas Record and Factual Findings

At the hearing on the four applicants' claims for post-conviction relief, Judge Priest heard testimony from S.L., her mother Rosemary, Dr. Doyle, Dr. Molett, and the four applicants, and he admitted documentary evidence offered by the applicants. The State did not challenge this evidence. Judge Priest made factual findings that the habeas evidence was credible, and I agree with that determination. I detail the evidence below to demonstrate that it is highly probative of the actual innocence of the four applicants in this case, particularly

when viewed in light of the weak and contradictory testimony that was presented at the applicants' trials that I have set out above.

**A. S.L.'s Recanted Testimony Proves that She Was Coached by Javier to Lie**

The significance of S.L.'s habeas testimony is that none of the four applicants sexually assaulted her and that she did not see them engage in any inappropriate behavior towards V.L. In her habeas testimony, she explained that she was coached and physically threatened by Javier to falsify the accusations against the four applicants.

At the age of twenty-seven, S.L. testified that she remembered Rosemary, her mother, and Javier, her father, fighting over her and her sister when they were in Colorado. She remembers visiting Liz's apartment with her sister when they were small and remembers that they liked going there to visit.

S.L. testified at the habeas hearing that the accusations against the four applicants arose from an incident in which Serafina caught V.L. kissing a female child, and Serafina screamed at the girls and accused them of learning the behavior from Liz. S.L. described herself pretending to be driving an imaginary car with V.L and a six-year-old female cousin as the backseat passengers. During that imaginary play, V.L. and the cousin started actually kissing with their mouths and tongues, upsetting Serafina when she walked in on the incident. Serafina screamed at the girls, and she reported the event to Javier, who also became upset. Javier yelled at the girls and accused their Aunt Liz of doing things to them. In her habeas testimony, S.L. implied that the girls had learned the behavior about kissing

with tongues by observing Javier. Specifically, S.L. said that, in her and her sister's presence, Javier was kissing a lady in a car in a parking lot and that he touched the lady's breasts while she and V.L. sat in the back seat.

S.L. testified that she was never in the apartment alone with all four of the applicants at the same time. She stated that the first time she ever saw Anna, one of the four applicants, was when she was shown a photograph of her after she had picked a different person out of a photographic line-up as the person who had sexually assaulted her. S.L. testified that she and her sister pointed at a different photo, and that the officer told them, "No, this is the person," and showed them a photo of Anna. She stated that from the time that Javier told them that something had happened to them until the time of the medical examination and the police report, they were coached on what to say by Javier. She testified that Javier would hit them with two-by-fours when they misbehaved and that he threatened violence against them if they did not comply with his demands. S.L. asserted that, just before she testified at the trial for three of the applicants, Javier told her that she could go to jail for lying to the police. She stated that she did not know what happened to the applicants after the trial because she was not allowed to ask about it or to talk to Javier about it.

S.L. testified that, throughout her years residing with him, Javier was physically abusive to her and her siblings. S.L. tried to commit suicide when she was fourteen years old and was taken away from the home. After that, S.L. lived in a group home, where she began to receive counseling. S.L. spoke with her sister about the events at Liz's apartment when

she was thirteen years old and her sister was fifteen. She testified that she told V.L. that she did not believe that anything ever happened at Liz's apartment, and her sister replied, "It may not have happened to you, but it happened to me."[8]

S.L. testified that, when she was pregnant with her second child, around the time she was nineteen-and-a-half years old, she told her counselor that the abuse allegations had been false, and her counselor urged her to do the right thing and come forward. When she was considering whether to come forward with her recantation, she told Javier that she did not think that the applicants had sexually abused her. Javier told her that, if she recanted, he would "hit [her] where it hurt." Javier followed up on his threat by reporting her to Child Protective Services, claiming that she neglected her children and used drugs. CPS took possession of S.L.'s children for about a month before they dismissed the case and returned S.L.'s children to her.

## B. Rosemary's Testimony Proved Javier's Pattern of Falsely Claiming Abuse

Rosemary Camarillo is the mother of S.L. and V.L, and she is Liz's sister. Rosemary testified that her husband, Javier, seemed to have a sexual attraction for Liz, who was a teenager when she moved in with Rosemary and Javier for a period of time. Javier would speak to Liz in private and would get quiet whenever Rosemary entered a room with them. Rosemary stated that she attempted to move away from Javier but that this ended in him

---

[8] The record is silent as to V.L.'s current beliefs regarding these charges. There is no indication in the record that V.L. was ever contacted about S.L.'s recantation or these habeas applications. It is unclear if anyone knows where V.L. is or if she was available to comment regarding these proceedings.

taking the children away from her. Rosemary further stated that Javier kept the children from her by making false allegations about abuse against Rosemary's friends. At one point, after she and her children had moved to Colorado in 1991, Javier pulled a gun on her and threatened to kill her during an argument, and all four of her children saw that incident. During that same weekend, he took their three children, including S.L. and V.L., back to San Antonio over her objections. That incident resulted in a custody battle for the three children. During that custody case, Javier made accusations that Oscar, a friend with whom they had stayed in Colorado, had sexually assaulted V.L. and S.L. during the visit. Rosemary testified that she knew that the accusation was false because the children had never been left alone with Oscar. Javier also made an accusation that a ten-year-old boy in Colorado had sexually abused the girls, and that accusation led to a police report and the prior 1992 sexual-assault examinations of S.L. and V.L.[9] Rosemary explained that the accusations against the boy were determined to be false because the girls had not been left with any ten-year-old boy. Rosemary testified that she was aware that Javier had made false accusations against others about sexual assaults of children. She stated that she has always believed that Liz was completely innocent of the charges. Rosemary has never known Liz to possess or talk about having a gun. She testified that after Javier took her children from Colorado, she had a hard time with visitation because it would result in Javier calling the police on her, and eventually

_____

[9] This false claim of sexual assault was what caused the 1992 sexual-assault examinations of S.L. and V.L. that Dr. Kellogg said had normal findings and that she used as a point of comparison with the 1994 sexual-assault examinations that were done due to the instant accusations of abuse.

she gave up and lost contact with her children. She did not see S.L. from the age of five until the age of eighteen, when S.L. came to live with her. She did not see V.L. from the age of seven until V.L. was eighteen years old. When S.L. and her husband and two children were living with Rosemary, S.L. told her that Liz and her friends had not sexually assaulted S.L. or V.L. Rosemary also remarked that Serafina previously made an accusation that her grandchild had been sexually assaulted, and that claim was later shown to be a false allegation.

The thrust of Rosemary's testimony was never heard by the juries that convicted the applicants. Liz attempted to introduce some of this evidence at her trial, but the trial court excluded the evidence, and the court of appeals upheld the exclusion. *Ramirez*, 1998 WL 412437, at *2. The court of appeals addressed Liz's complaint that the trial court excluded Rosemary's testimony that would have explained (1) that V.L. had observed Javier threaten Rosemary by pointing a gun at Rosemary's head, and that is why V.L. knew about guns so as to mention them as part of this purported assault, and (2) that V.L. had observed her father drink tequila in his own residence, and that is why V.L. knew to mention drinking as part of this purported assault. *Id*. Liz argued that the evidence was critical because the investigating officer did not find a gun when he searched Liz's apartment where the claimed assaults had occurred. *Id*. The court of appeals held that the evidence was irrelevant and properly excluded by the trial court. *Id*. The court of appeals stated, "Without evidence that V.L. may have confused such events with the facts of her assault, the evidence Ramirez sought to

present would not have made it more or less probable that V.L. made up her story." *Id.*

Hindsight, of course, is twenty-twenty. Given that S.L. has now credibly recanted her claims of abuse, and given that Dr. Kellogg has retracted her prior medical testimony, Rosemary's testimony takes on a new light at this juncture. Rosemary's testimony that Javier had a pattern of making false accusations, that V.L. and S.L. had seen him threaten her with a gun, and that they had seen him drinking would likely have influenced the jury to believe that the detailed facts presented by V.L. and S.L. about the gun and alcohol were developed from experiences that occurred at places other than Liz's apartment.

**C. Dr. Doyle's Testimony Supports the Credibility of the Recantation**

Dr. Alexandria Doyle, a licensed clinical psychologist, testified that, based on her scientific expertise, there was never any sexual abuse of S.L. or V.L. and that S.L.'s recantation comports with that psychological assessment.

Dr. Doyle has expertise in evaluating both true and false claims of sexual abuse. She was contacted by the Innocence Project of Texas to evaluate S.L. regarding her recanted testimony. Before interviewing S.L., Dr. Doyle reviewed the prior trial testimony of S.L., V.L., and Dr. Kellogg; the police reports; CPS reports; the complainants' school records; and medical records. In 2013, Dr. Doyle spent five hours interviewing and evaluating S.L. for the purpose of assessing the reliability of her recantation of her childhood claim of abuse. Dr. Doyle concluded that she could not "find one piece of evidence that is—or statement that is consistent with what we would expect in a true sexual abuse allegation. I can't find one

piece of evidence that even begins to comport to that."

One of the matters considered by Dr. Doyle was the plausibility of the events underlying the original claim of abuse. She said that the information presented at the time of the original allegation was not consistent with a true sexual-abuse allegation. She concluded that the case "doesn't even pass the smell test."

Another questionable circumstance that Dr. Doyle took note of was the fact that the outcry was to a family member in a family that has custody-dispute issues. Here, the revelation of the purported abuse was to Serafina, a family member, rather than to a neutral party, and Dr. Doyle found that this was a basis for questioning its reliability. She stated that allegations coming from a parent or family member are less reliable than those coming from a neutral party, like a teacher, especially when there are custody issues involved. Dr. Doyle also questioned the credibility of the outcry to Serafina based on V.L.'s claim that she spontaneously decided to report the purported abuse because, in Dr. Doyle's opinion, that would be highly unusual. She further explained that the spontaneous outcry from both complainants on the same afternoon was highly unusual.

Another matter considered by Dr. Doyle was whether the complainants or a family member of the complainants had a possible motive to falsify an event. She testified that the ongoing custody dispute between Javier and Rosemary gave Javier a motive to falsify the claims. She further noted that, given that the complainants feared Javier, they had their own motivations to comply with his demands. Dr. Doyle explained that, generally, children will

defer to an abusive authority figure. Further, she said that the more authority a person has, the more compliant children will be. Dr. Doyle additionally observed that, even decades after the convictions, when S.L. indicated that she intended to recant the accusations against Liz, Javier continued to operate under a revenge motive against S.L. by making a false CPS report against her, causing her to have her children temporarily taken away.

Another matter considered by Dr. Doyle was whether the description of the purposed sexual abuse comported with credible reports made by other sexual-abuse victims. She testified that she has "interviewed hundreds of people who have been sexually abused" and she has "never heard anything that even came close to this." She explained that, as the events were described by S.L. and V.L, there was "nothing seductive" and "nothing sexual about it." She observed that the events compare more to fraternity hazing than a true sexual assault. She characterized the events with disbelief, calling them a "fantastic story." Continuing with that characterization of this case, Dr. Doyle expressed that Serafina's assertion that the children's vaginas showed signs of having been exposed to cocaine in the weeks after the allegation was a completely fantastical claim because, even if it had ever existed, it would have disappeared long before the passage of weeks.

Another matter considered by Dr. Doyle was how the allegations in the story might have been developed. Dr. Doyle expressed her belief that the girls pieced together the story from other experiences and that "they were being drilled, coached, and asked questions in a way that generated this story." She further opined that "you can tell it's a generated story

because it doesn't make sense." Dr. Doyle explained that the girls had seen Javier scream and point a gun at their mother when they were in Colorado, and this experience likely served as the basis for the girls' assertion that the applicants screamed and pointed at them during the purported assault. Dr. Doyle further explained that the girls had seen Javier kissing a girlfriend and taking off her blouse to touch her breast, and that experience could have prompted the girls to describe the applicants as having kissed them and touched their breasts.

Dr. Doyle also testified regarding changes in techniques in the investigation of child sexual-abuse allegations from the time these allegations were made until now. She explained that these allegations were investigated by a homicide detective, who would not have had the background in dealing with interviewing children and these types of allegations. She also pointed to the fact that the complainants were sometimes interviewed together, which would enable them to suggest answers and put ideas in each other's minds, whereas now the complainants would always be interviewed separately. She observed that the interviewers now are also not usually police detectives, but social workers who ask open-ended questions so that the children may develop their own narrative, unlike the interviews that occurred in this case in which the children answered many leading questions and never developed their own sequence of events.

Dr. Doyle testified as to her opinion that S.L.'s recanted testimony was credible in the way that it came out through a counseling session to a neutral person. She expressed that S.L. was able to come forward because, after she had tried to commit suicide, she had moved

into a group home and had never lived with Javier again. According to Dr. Doyle, this gave S.L. the ability to be oppositional to Javier's status as an authority figure in her life.

Dr. Doyle opined as to the alternative reasons that V.L. might not have disavowed her allegations against the four applicants, explaining that once the data is tainted, as here, it is difficult to know what really happened. Dr. Doyle also expressed that the more times misinformation is repeated to a person, the more the information gets solidly embedded into the person's head. Assuming the correctness of Dr. Doyle's opinion that the allegations were fabricated, this would explain why V.L. has been unable to acknowledge the falsity of her prior testimony.

Dr. Doyle's habeas evidence is significant because she explains that S.L.'s and V.L.'s trial testimony was suspect given the circumstances under which it occurred, that S.L.'s recantation came forth in a manner that suggests it is credible, and that, even if V.L. maintains her view that she was abused, this is likely because of the coaching by Javier that has become embedded into her recollection of the events.

**D. Molett's Testimony Proves that the Four Applicants Are Not Sex Offenders**

Maria Molett is the current executive director of the Counseling Institute of Texas. Previously, Molett spent ten years as a member of the governor-appointed Council on Sex Offender Treatment, which is the organization that makes determinations and policies regarding civil commitment of sexually violent predators. This Council has determined that polygraphs are a proper tool for monitoring sex offenders and that, when used for this

purpose and in accordance with the special training the examiners have received for these types of cases, she believes that these types of polygraphs are over ninety-nine percent accurate, although there can be false positive results.

In 2013, Molett conducted psychosexual evaluations on the three applicants Liz, Cassie, and Kristie, all of whom were still in prison when these applications were being investigated. She testified that as part of her evaluation, she reviewed all of the records of the offenses for which the applicants were convicted. Molett did a risk assessment, a Hare Psychopathy, and a community supervision risk assessment level of service inventory.

As part of her assessment of the applicants, Molett relied on polygraph tests, which is a standard practice in this field as a tool for monitoring sex offenders' compliance with treatment initiatives. As used in the treatment of sex offenders, there are four types of polygraph examinations: questions about the instant offense, questions on the sexual history of the offender, questions monitoring compliance with supervision rules, and questions aimed at whether the offender has re-offended. The last two of these were not applicable in this case, but the first two were. Molett reported that the three applicants that she evaluated passed each of those polygraphs.

Liz passed both polygraph tests, showing no deception in her answer that she did not commit the offense and showing no sexual deviant behaviors, arousals, or interests. Liz scored very low on the Hare Psychopathy inventory and very low on her risk assessment to re-offend. Molett testified, "It's my professional opinion that [Liz] does not classify or fall

into any sort of classification [as a] sex offender. Due to the polygraphs, she did not commit the offense. And the sex history polygraph proves that she never engaged in deviant sexual behavior in her life."

Molett used the same tools for the evaluation of Cassie as those used for Liz. Molett reached the same conclusion "that she did not commit the offense. She does not classify or categorize as a sexual offender, and she has nothing in her history that is of a sexual[ly] offensive nature."

Molett conducted the same evaluation on Kristie and reached the same conclusion "that she is also being honest, that she did not commit the offense. And she doesn't have any deviant sexual history in her background."

Although she did not perform an evaluation of Anna, Molett looked at her polygraph results and the records of the person who did the evaluation on Anna. Molett determined that Vasquez did not commit the offense and has never committed such an offense.

Molett concluded that, in her professional opinion, the applicants "didn't do the offense." Because the underlying criteria on which she based her opinion included more than polygraph results, Molett's opinion was properly considered by the habeas court. *Compare Leonard v. State*, 385 S.W.3d 570, 577 (Tex. Crim. App. 2012). In *Leonard*, although it held that adjudication of Leonard's guilt on the sole basis of evidence of deception on a polygraph test was improper, this Court did not rule out the possibility that polygraph examinations could be included as part of the information used by an expert to reach his conclusions. *See*

*id.* Recently, in my concurring opinion in *Ex parte Harvin*, I agreed with a majority of this Court that Harvin's favorable polygraph results were inadmissible standing alone, as they had been offered in that case. *See Ex parte Harvin*, __S.W.3d__, No. WR-72,328-03 (Tex. Crim. App. Sept. 21, 2016) (Alcala, J., concurring). But, in *Harvin*, I acknowledged that polygraph evidence might be appropriately considered in a post-conviction habeas proceeding to the limited extent that it is part of the underlying foundation for an expert's opinion, and to the limited degree that it might assist the habeas court in assessing the credibility and weight of an expert's testimony in a given case. *See id.* This type of evidence may be particularly probative with respect to the testimony of an expert who is assessing whether a person is a sex offender, given that the criminal-justice system considers polygraph testing sufficiently reliable for the purposes of treating sex offenders. *See id.* (citing 22 TEX. ADMIN. CODE § 810.64(c)(18)) ("polygraph examinations shall be used as a part of a comprehensive treatment program"). I, therefore, conclude that, as long as polygraph evidence is included as part of the information on which an expert's opinion is formed, particularly with respect to testimony regarding characteristics of sex offenders, that evidence might be properly considered as part of an expert's more global opinion in a particular case in the post-conviction habeas context before a judge. *See id.*

Here, Molett's opinion testimony was based on more than mere polygraph results and instead took into account additional considerations such as the risk assessments, Hare Psychopathy, and community supervision risk assessment level of service inventory, and thus

it could be properly considered as evidence in this case. *See id*.

### E. The Four Applicants Have Consistently Maintained Their Innocence

It is highly persuasive that all four of the applicants have always maintained their innocence of these offenses. It seems exceedingly unlikely that, had any improper sexual acts involving these four applicants ever occurred, all four of them would have been able to continuously demonstrate that they are not sex offenders.

At age forty, Liz testified at the habeas hearing and denied having committed the offenses. At that point, Liz had served seventeen years in prison for the offenses. Liz described her relationship with the two complainants and Javier. Liz said that, in 1990, she was emancipated at the age of sixteen, and by the time of the accusations against her, she was nineteen years old. At sixteen years of age, Liz moved in with Rosemary and Javier, when the two complainants were very young, and she slept in a twin bed with V.L. During that time, Javier would try to get Liz alone with him, which made her feel awkward and she didn't understand why he was doing it. She testified that, after he confronted her about being a lesbian, Javier told her that he did not approve of her sexual orientation, so she moved out of his and Rosemary's house. Even after that, Javier continued to take an interest in Liz, taking money to her and going to see her without Rosemary. Liz explained that when Javier, who had expressed his desire for her over the years, learned that she was pregnant, he asked her to marry him so that he could raise the child as his own. She rejected him, explaining that her baby had a father, which angered Javier. She also explained that, at the time of the

accusations against the applicants, Javier and Rosemary were separated and divorcing.

Kristie denied the offenses. She was twenty-one years old when she was convicted of these offenses and she spent thirteen years in prison. She is now forty-two years old. She stated that the parole board told her that she would have to take the sex-offender treatment program in order to be released to parole, but she refused to do that because she "was never going to admit to something that never happened." She took a polygraph test, had a psychosexual evaluation, and took another polygraph after that evaluation. She passed both polygraphs and the evaluation. She maintains that all of the applicants are innocent. She has been released from prison on bond.

Cassandra denied the offenses. She was nineteen years old when she was convicted and spent thirteen years in prison. She said that she refused to take the sex-offender treatment program even if it would allow her to be paroled because she would have to admit that she was guilty, and she was unable to say that. She testified that all four applicants are innocent and that there is nothing in her original trial testimony that she would change. She has been released on bond.

Anna denied the offenses that she was accused of having committed at nineteen years of age. She testified that she first met Javier when Liz was living with his family, while she and Liz were still in high school. At that time, Anna believed that Javier was making sexual advances towards Liz based on Liz's statements about Javier. Anna testified that she never had access to a gun, nor did she ever see a gun at Liz's apartment. She also talked about the

sex-offender treatment program in prison, stating that the day she arrived at the unit for the treatment program, she told the counselors that she was innocent and would not participate in the program. She testified that she was aware that she would not be paroled if she did not participate in the program. She was sent to solitary confinement for refusing to participate in sex-offender counseling. Later, she had a psychosexual evaluation, and the favorable results from that evaluation excused her from sex-offender classes. She was eventually released from the program for non-participation after about three or four months. She testified that, after a prison official received her favorable results on a polygraph, she was paroled in 2012 without being required to complete the sex-offender treatment program. As part of her parole conditions, she took and passed a polygraph given by the Texas Department of Public Safety. She stated that, as a condition of parole, she could not have any contact with children under the age of eighteen, including her own family, which has been very difficult for her because she has many young family members.

### G. Both Habeas Judges Believed All the Habeas Evidence Was Credible

With respect to the four applicants' claims for relief on the basis of new scientific evidence, the parties agreed to the factual findings, and both habeas judges made factual findings and legal conclusions in support of granting habeas relief. The recommendation to grant relief is based on the existence of new scientific evidence due to Dr. Kellogg's erroneous trial testimony that V.L.'s hymenal scar was proof of sexual abuse.

With respect to the four applicants' claims for relief on the basis of actual innocence,

only the second habeas judge addressed that claim, and he declined to recommend that this

Court grant relief on it. The judge determined that the lack of a recantation by V.L. was

enough evidence to hold that the applicants had failed to clearly and convincingly show that

another jury would not convict them because a jury could find V.L.'s testimony alone to be

credible despite the evidence contrary to it. The habeas judge states in his findings,

> Since [V.L.] has not recanted her testimony; presumably that testimony would
> be available to the State in the event of a retrial. At any new trial, a new jury
> would be required to balance the conflicting evidence in order to determine
> whether the allegations, or any of them, had been proved beyond a reasonable
> doubt. There are only two eyewitnesses, and one of them continues to assert
> the truth of her trial testimony. The credibility of these two witnesses is an
> issue for the jury to decide, and no scientific evidence conclusively settles the
> matter. Therefore, though it appears that the State might have great difficulty
> in sustaining the allegations of the indictments in the event of a retrial, it
> cannot be said that the Applicants have established by clear and convincing
> evidence that no reasonable juror could convict Applicants in light of the new
> evidence.

The habeas judge concluded that, "[t]hough the newly discovered evidence severely

'muddies the waters', the evidence does not unquestionably establish innocence as required

by, among other cases, *Ex parte Elizondo*, 947 S.W.2d 202 (Tex. Crim. App. 1996), *Ex Parte

Reed*, 271 S.W.3d 698 (Tex. Crim. App. 2008), and *Ex parte Navarijo*, 433 S.W.3d 558

(Tex. Crim. App. 2014). Therefore, Applicants should have a new trial, but their claim of

having sufficiently established their actual innocence should be denied."

In his findings of fact, this judge mirrored S.L.'s habeas testimony, thus indicating his

belief of it. His findings note that S.L. recanted her testimony regarding the applicants'

abusive conduct, and he notes that S.L. now says that no such events ever occurred to her or

to V.L. The habeas court found that S.L. was credible in her explanation that Javier instigated these complaints against the applicants because he learned that V.L. had kissed another child of the same sex, and Javier assumed that V.L. had done that due to the influence of "Aunt Liz" and her friends. The habeas court further found credible S.L.'s statement that Javier and his mother Serafina talked to the complainants and suggested that the girls had seen improprieties at Liz's house and that Liz and her friends had behaved inappropriately with the girls. S.L. complied with Javier's pressure because he was violent and threatening towards her. S.L. considered coming forward with her recantation when she was nineteen, after she informed a counselor that her testimony had been untruthful, but Javier told her that she would be prosecuted for lying and go to prison, so she did not. Later, when S.L. told Javier that she planned to go forward with her recantation, Javier told her he would "hit her where it hurts" if she did, and he made a false report to CPS regarding her parenting of her own children.

In view of the entirety of the trial and appellate records, the evidence shows, and the habeas judges appear to agree, that Javier pressured S.L. and V.L. to falsify allegations against the four applicants. Javier was motivated by a reaction to learning that V.L. had kissed a female child, by his custody dispute with Rosemary, and by his desire to attack Liz for her sexual orientation and her rejection of his advances towards her. Many of the details described by S.L. and V.L. were familiar to them based on what they had seen in their turbulent familial relationship with Javier. Having already explained why I agree with the

habeas judges' determinations that the applicants are entitled to relief on the basis of the new scientific evidence, I next explain why I disagree with the habeas judge's assessment that the evidence fails to meet the clear-and-convincing standard required for actual-innocence claims.

### III. Applicants Have Proven Their Actual-Innocence Claims

As explained above, only the second habeas judge addressed the applicants' actual-innocence claims, and his legal conclusion was against granting that type of relief due to the absence of hard evidence to establish the applicants' innocence. In particular, the second habeas judge determined that, because "no scientific evidence conclusively settles the matter," the four applicants could not prevail on their actual-innocence claims. He further reasoned that, because V.L. has not recanted her testimony, presumably that testimony would be available to the State in the event of a retrial, and thus it should be left to a new jury to balance the conflicting evidence and weigh the witnesses' credibility in order to determine whether some or all of the allegations were true beyond a reasonable doubt. Thus, although he acknowledged that the State "might have great difficulty in sustaining the allegations in the event of a retrial," the second habeas judge concluded that the applicants have failed to unquestionably establish their innocence.

I conclude that the second habeas judge's conclusion of law with respect to this matter was mistaken, and thus this Court owes no deference to that legal conclusion. Hard scientific evidence is not a prerequisite for granting relief on the basis of actual innocence. Rather,

what is required is that the evidence, in whatever form it appears, demonstrate by clear and convincing evidence that no reasonable juror would have convicted the applicants in light of the new evidence. In finding S.L.'s recantation credible and in acknowledging the extreme unlikelihood that the State could obtain a conviction upon a retrial, it appears that the second habeas judge effectively determined, in seeming contradiction to his own legal conclusion, that V.L.'s trial testimony can no longer be viewed as credible. On that basis, I conclude that the applicants have satisfied their burden of showing that no reasonable juror would have convicted them in light of the new evidence and thus they have satisfied the actual-innocence standard.

### A. Applicable Law for Actual-Innocence Claims

In *Ex parte Elizondo*, this Court held that a convicted individual is entitled to post-conviction relief on the basis of a due-process violation if he can establish by "clear and convincing evidence" that "no reasonable juror would have convicted him in light of the new evidence." *See Elizondo*, 947 S.W.2d at 209; *see also Ex parte Brown*, 205 S.W.3d 538, 544 (Tex. Crim. App. 2006) (stating standard for reviewing actual-innocence claims as being proof by "clear and convincing evidence that, despite the evidence of guilt that supports the conviction, no reasonable juror could have found the applicant guilty in light of the new evidence") (citations omitted). In *Elizondo*, this Court explained that a reviewing court must decide "whether the newly discovered evidence would have convinced the jury of [the] applicant's innocence." *Elizondo*, 947 S.W.2d at 207. To determine whether an applicant

has met this standard, the habeas court must "examine the new evidence in light of the evidence presented at trial." *Ex parte Thompson,* 153 S.W.3d 416, 417 (Tex. Crim. App. 2005). In *Elizondo*, this Court further explained:

> Because, in evaluating a habeas claim that newly discovered or available evidence proves the applicant to be innocent of the crime for which he was convicted, our task is to assess the probable impact of the newly available evidence upon the persuasiveness of the State's case as a whole, we must necessarily weigh such exculpatory evidence against the evidence of guilt adduced at trial.

*Elizondo*, 947 S.W.2d at 206; *see also Ex parte Franklin*, 72 S.W.3d 671, 677-78 (Tex. Crim. App. 2002) (same). Relief is not warranted without an applicant having made an "exceedingly persuasive case that he is actually innocent." *Elizondo*, 947 S.W.2d at 206; *see also id.* at 209 (stating that, in case of freestanding claim of innocence, the habeas court "must be convinced" that the new facts "unquestionably establish" the applicant's innocence; "unquestionably establish" means the same thing as by "clear and convincing" evidence).

On post-conviction review of an application for a writ of habeas corpus, the convicting court is the original fact-finder, and this Court is the ultimate fact-finder. *See Ex parte Weinstein*, 421 S.W.3d 656, 664 (Tex. Crim. App. 2014) (citing *Ex parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012)). This Court ordinarily defers to the habeas court's factual findings, particularly those related to witness credibility and demeanor, when those findings are supported by the record. *Id*. This Court similarly affords deference to the habeas court's rulings on mixed questions of law and fact, if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id*. (citing *Guzman v. State*, 955 S.W.2d

85, 89 (Tex. Crim. App. 1997)).  On the other hand, "[w]hen our independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record, we may exercise our authority to make contrary or alternative findings and conclusions." *Ex parte Flores*, 387 S.W.3d 626, 634-35 (Tex. Crim. App. 2012).  This Court reviews de novo mixed questions of law and fact that do not turn on an evaluation of credibility and demeanor. *See Weinstein*, 421 S.W.3d at 664 (citing *Guzman*, 955 S.W.2d at 89).

In applying this standard in the context of a habeas court's factual findings with respect to the credibility of a complainant's recantation, this Court will ordinarily defer to such a finding by the habeas court if the evidence supports the finding. *See Navarijo*, 433 S.W.3d at 571-72.  But even if this Court defers to the habeas court's factual findings, this Court is not necessarily bound to defer to the habeas court's legal conclusion as to whether the evidence establishes an applicant's actual innocence. *See id.* In determining whether the newly discovered recantation evidence establishes an applicant's actual innocence, this Court has in the past considered matters such as (1) whether a habeas court has found that a complainant's recantation was credible and whether that finding was supported by the record, (2) whether a complainant's allegation of abuse was supported by medical evidence at trial, and whether the habeas court's findings and the habeas record show how the medical evidence could be consistent with the recantation, (3) whether a complainant's testimony at trial was detailed and generally consistent, and whether the habeas court's findings and habeas record have adequately explained how that could have occurred if the testimony was

untrue, (4) whether the new evidence of recantation was similar to evidence heard by the fact finder at the time of the trial so that the record shows that the discrepancy had already been resolved by the fact finder, (5) psychological evidence explaining the possible motivations for the original accusation and the recantation, and (6) anything else that may be pertinent in the entirety of the record. *See id.* Although these factors are not exclusive, they serve as useful guideposts here in assessing whether the applicants have satisfied the actual-innocence standard.

**B. Analysis of Relevant Considerations Shows that the Applicants Are Actually Innocent**

Although his factual findings are almost a wholesale adoption of S.L.'s habeas testimony, the habeas judge then made a conclusion that the "credibility of these two witnesses is an issue for the jury to decide," and, on that basis, he rejected the applicants' actual-innocence claims. The judge explained that S.L. testified that V.L. told S.L. a few years earlier that she stands by her former testimony and that the assault did occur. V.L., however, did not testify at the habeas hearing. As explained further below, I disagree with the habeas court's legal conclusion that actual-innocence relief is precluded here merely because V.L. maintained her prior testimony in her statement to S.L. several years ago.

**1. Second Habeas Judge Found that S.L.'s Recanted Testimony Was Credible**

With respect to the weight to give the second habeas judge's factual determination that S.L.'s recantation testimony is credible, I would give that finding considerable weight because this judge is the same one who presided over the jury trial at which three of the

applicants were convicted. This judge heard S.L.'s testimony against the three applicants at their trial and he heard S.L.'s recantation testimony. For this reason, he is in a superior position to judge S.L.'s credibility based on his having observed her at both the habeas hearing and the three applicants' jury trial.

Another matter that this Court has considered when determining whether recantation testimony is credible is whether it has an adequate amount of detail so as to warrant a finding that it is significantly more persuasive than the evidence of an applicant's guilt. In *Ex parte Brown*, this Court held that Brown had failed to satisfy the actual-innocence standard, in part, because the *Brown* complainant's recantation testimony at the habeas hearing was "vague, uncertain, and nonspecific," with that complainant merely "claim[ing] a lack of memory" while "mak[ing] a global denial of sexual abuse." *See Brown*, 205 S.W.3d at 547. Under those circumstances, the Court held that the *Brown* complainant's explanation of what had really happened, seven years after the event, was "dubious at best," and was not, therefore, sufficient to establish Brown's innocence. *Id*. In contrast, here, the credibility of S.L.'s recanted testimony is supported by Dr. Kellogg's revised medical opinion, the psychological evidence, and the testimony of numerous other witnesses. S.L.'s recantation discusses in detail the events that were transpiring at the time that the false accusations came to light, and she has explained the underlying motivations that compelled her and V.L. to fabricate those allegations. S.L.'s recanted testimony has explained persuasively why she failed to come forward sooner, what events transpired that enabled her to report her recantation, and the

detailed reasons for her earlier false testimony. These circumstances support the strength of S.L.'s recanted testimony as a basis for granting actual-innocence relief in this case.

**2. The Former Medical Evidence of Sexual Abuse Has Been Disavowed on Habeas**

The two habeas judges made findings of fact that Dr. Kellogg conducted sexual-assault examinations of the two complainants and concluded that scarring on V.L.'s hymen was due to forceful vaginal penetration, but this determination was later proven to be incorrect. About fifteen years after the applicants' trials, in 2013, based on new scientific information that has evolved from studies published after 1997 and thus was not available at the time of her 1997 testimony, Dr. Kellogg testified that she "cannot determine with reasonable medical certainty whether [V.L's] hymen had ever been injured at the time of the 1994 [sexual-assault] examination." Dr. Kellogg explained, "Consequently, at the time of my testimony in these trials, it was generally believed within the field of pediatrics that injuries to the hymen often left observable scars or evidence of healing. We now know that while this can occur, it is uncommon." The habeas court found that, at trial, "the State relied heavily on Dr. Kellogg's expert testimony to establish first, that the crime as alleged, in fact occurred; and second, to corroborate the complaining witness's testimony." The habeas court also found that there "is a reasonable probability that the outdated medical testimony concerning the 'hymenal scar' was indicative of penetrating trauma to the hymen [and] contributed to the jurors' belief that the offenses did occur." The habeas court continued,

Based on the foregoing evidence and analysis, this Court is satisfied that [the

applicants have] presented evidence that McCann's 2007 scientific study reflects new science, not available in 1997, that it is authoritative, that it would be admissible under the Texas Rules of Evidence, and that both the study and the new evidence it reflects, contradicts Dr. Kellogg's 1997 testimony that the hymenal scar was the result of a tear caused by penetrating trauma with some object.

The habeas judges concluded that, more likely than not, had this newly available, relevant scientific evidence regarding hymenal injuries been presented at trial, the applicants would not have been convicted of these offenses.

Dr. Kellogg's retraction of her former medical testimony constitutes an additional circumstance that strengthens the applicants' claims of actual innocence. Here, when it convicted applicants, the juries were under the mistaken impression that there was affirmative evidence of some sexual abuse having occurred, and the habeas record now shows the absence of any medical evidence to support that conclusion. The combined force of S.L.'s credible recantation and the new scientific evidence that has undermined the medical testimony presented at trial distinguishes this case from other situations in which the medical evidence presented at trial remained viable in spite of the complainant's recantation. *See Navarijo*, 433 S.W.3d at 570. In *Navarijo*, by contrast, this Court observed that the jury did have persuasive medical evidence of sexual abuse, and neither the applicant nor the recanting complainant was able to explain those medical findings in a way that would be consistent with the recantation. *See id.* Thus, as compared to *Navarijo*, the present record presents this Court with a more persuasive basis upon which to conclude that, absent the medical testimony, and in light of S.L.'s credible recantation, a reasonable jury would not

have believed the remaining testimony and would instead have acquitted the applicants.

**3. The Juries that Convicted Applicants Never Heard S.L.'s Recantation**

S.L.'s recanted testimony was never heard by the juries that convicted the four applicants. S.L. did not testify before the jury that convicted Liz. S.L. did testify before the jury that convicted the three other applicants. It cannot be said, therefore, that S.L.'s recantation would not have had significant persuasive value to the juries that convicted the four applicants.

The fact that the juries never heard S.L.'s recanted testimony is another circumstance that distinguishes this case from *Navarijo*. *See id.* at 569-70. Among the considerations taken into account by this Court in denying Navarijo's actual-innocence claim was the fact that the complainant in that case had also recanted prior to Navarijo's trial and the jury knew about the recantation, but the jury disregarded the recantation as lacking in credibility and convicted Navarijo anyway. *See id*. The same cannot be said in this case, in which the juries who convicted the applicants never heard that S.L. had recanted her testimony. Whereas the jury's consideration of the prior recantation weighed against a finding of actual innocence in *Navarijo*, here there is no similar circumstance that would affect this Court's assessment of the actual-innocence claims in these cases.

**4. Expert Psychological Evidence Explains that Recantation Was Credible**

In deciding whether to grant habeas claims of actual innocence, this Court has considered the testimony of experts who have training in the detection of false sexual-abuse

allegations and false recantations, but those experts' conclusions are not dispositive. *See id.*;

*Ex parte Harleston*, 431 S.W.3d 67, 79 (Tex. Crim. App. 2014) (denying relief on an actual-

innocence claim, in part, because the testimony by K.D., the recanting witness at the live

habeas hearing, was "internally inconsistent and present[ed] implausible explanations" of

why K.D. would have fabricated sexual-assault allegations against Harleston, and in part

based on the State's evidence at trial that included "a number of witnesses who supported the

circumstances of K.D.'s sexual-assault outcry as genuine").  Here, the applicants'

psychological experts have detailed their reasons for finding S.L.'s recantation significantly

more credible than the trial testimony that was introduced in this case.  In particular, Dr.

Doyle opined that the original trial testimony in this case was entirely implausible based on

the nature of the alleged abuse, the manner in which the outcries were made, the existence

of motivations to lie both on the part of the complainants and their father, and the use of

improper interviewing techniques that may have influenced the complainants' stories, among

other matters.  In contrast to her opinion that the trial testimony was entirely implausible, Dr.

Doyle testified as to her belief that S.L.'s recantation testimony was credible, both in terms

of the substance of the recantation and the manner in which it came to light.  The expert

testimony of Dr. Doyle thus constitutes an additional circumstance that weighs in favor of

finding S.L.'s recantation testimony far more persuasive and credible than the original trial

testimony that was presented in this case.

**5. The Entire Record Establishes that the Recantation Evidence is More Credible than the Evidence of Guilt Presented At Trial**

The instant case is more like the situation that was before this Court in *Ex parte Thompson*, in which this Court held that the complainant's recantation was adequate to meet the actual-innocence legal standard. *See Thompson*, 153 S.W.3d at 418, 420 (granting relief on basis of recantation from complaining witness, in part, because results of complaining witness's sexual-assault examination were "completely normal"). This case is also analogous to the situation in *Elizondo*, in which this Court granted actual-innocence relief, in part, because the conviction was based "solely" upon the testimony of the recanting witness and because there was a "complete lack" of any other inculpatory evidence, either "direct or circumstantial," to show Elizondo's guilt. 947 S.W.2d at 209-10.

As explained above with respect to Dr. Kellogg's revised medical opinion in this case, here there is no medical evidence showing that S.L. or V.L. was ever sexually abused. Dr. Doyle has further explained that, based on her expert psychological understanding of sexual-abuse incidents, S.L.'s recantation is credible in describing how these fabricated claims of sexual abuse might have arisen, and S.L.'s and V.L.'s story at trial about the abuse was inconsistent with how sexual abuse of children generally occurs. Dr. Doyle provided a reasonable explanation for why S.L. had recanted but V.L. had not, given that S.L. had moved into a group home away from Javier and had entered into counseling. Dr. Doyle explained that, even if V.L. maintained her view that she had been abused, her perceived memories likely would not be reliable in this case. Rosemary and S.L. stated that Javier had a pattern of falsely accusing those whom he believed had somehow wronged him. Other

expert testimony established that none of the four applicants have characteristics of sex offenders.

In view of the entirety of the record, I conclude that the evidence clearly and convincingly shows that the four applicants are actually innocent of these offenses, even assuming that V.L. would maintain the validity of her trial testimony accusing the four applicants of having sexually abused her. I conclude that the habeas record has so thoroughly undermined the credibility of any evidence that remains standing against the applicants following these habeas proceedings, including V.L.'s trial testimony, that the applicants have shown that they are actually innocent of these offenses. Based on the presentation of expert psychiatric testimony about the characteristics of sexual abuse of children and the falsification of accusations by children, it is highly implausible that there was any sexual offense that occurred in this case. I, therefore, conclude that it is appropriate to grant these applicants actual-innocence relief.

## IV. Conclusion

The four applicants have met their burden to demonstrate by clear and convincing evidence that no reasonable juror would have convicted them in light of the new evidence. The credibility of S.L.'s recantation, combined with the retraction of Dr. Kellogg's medical testimony and the otherwise weak and contradictory testimony presented at the applicants' trials, all lead me to conclude that the applicants have satisfied the standard to be declared actually innocent. Having conducted an independent review of both the trial and habeas

records in this case, I conclude that the applicants have established their innocence of the offenses for which they were convicted, and I, therefore, would grant them habeas relief on that basis. I thus concur in this Court's judgment.

Filed: November 23, 2016

Do Not Publish